# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF ARKANSAS,

## At the May Term, A. D. 1859.

---

### BORDEN ET AL. VS. PEAY, RECEIVER, ETC.

A part payment by one of several joint debtors, of a debt barred by the Statute of Limitations, revives the debt as to him and forms a new point from which the Statute begins to run, but does not revive the debt as against the other joint debtors. (*Biscoe et al. vs. Jenkins et al.* 5 *Eng. R.* 108.)

Where a demand is strictly a legal one, and enforceable in equity only on the ground that one of the makers of the note has become one of the trustees of the creditor, and a necessary party plaintiff, the rules of limitation applicable to an action at law upon the note, must govern the remedy in equity (*Faulkner et al. vs. Thompson et al.* 14 *Ark.* 479.)

It is a well established rule, applicable to suits in equity as well as at law, that evidence of a parol contemporaneous agreement contradicting or varying the written contract of the parties, is inadmissible. And so, in a suit upon a note payable at a specified future day, the defendant will not be permitted to introduce evidence of a parol contemporaneous agreement that the note was to be paid at a different day or in a different manner; as that the parties had agreed that the note was to be paid

in work, and that the collection of it was to be delayed that the debtor might have the benefit of such agreement.

Nor will the creditor be allowed to set up such agreement as an excuse for delay in suing, and thus avoid the Statute of Limitations.

Where a debtor does work for his creditor, at different periods, in payment of his indebtedness, and the account for such work is stated, allowed and appropriated by the parties, as a payment, the aggregate amount of the account will be a payment as of the date of the statement, allowance and appropriation, and not as of the dates of the several items of the account, in the absence of any agreement to that effect.

The maker of a note to the Trustees of the Real Estate Bank, is appointed a Trustee after an action upon the note is barred by the Statute of Limitations—his acceptance of the trust did not revive the barred debt.

### Appeal from the Chancery Court of Pulaski County.

Hon. HULBERT F. FAIRCHILD, Chancellor.

WATKINS & GALLAGHER, and BERTRAND, for the appellants.

The bill alleges, by way of avoidance of the Statute of Limitations as to Chase, that he was a Trustee for the Bank, and that it was his duty to have collected the note sought to be recovered in this suit. This would not avail the complainant anything, because, as the proof shows, he did not become Trustee until the month of May, 1849, before which time the note was barred. *Faulkner et al. vs. Thompson et al.* 14 *Ark. Rep.* 480; *Grant ad. vs. Ashley & Buchanan,* 7 *Eng. Rep.* 762.

More than three years had elapsed after the note was due, before the payment in 1848, appropriated as of the 3d February; and the subsequent payment by the principal debtor did not revive the debt as to his securities—part payment by one joint and several debtor, after debt is barred by Statute of Limitations, does not revive it as to other parties. *Biscoe vs. Jenkins,* 5 *Eng.* 108.

Parol evidence could not be introduced to show that at the time of the execution of the contract it was agreed that the same should be paid in printing. *Greenl. Ev. sec.* 275. But admitting the agreement as alleged, the account for printing could not operate as part payment until it was appropriated as

such—both parties mutually agreed to appropriate the amount of the account for printing, as on the 3d of February, 1848, after the bar had attached.

CUMMINS & GARLAND, for appellees.

Leaving out of view the interests of all persons, except the direct debtor and creditor, there can be no dispute about the law, that they can make any transfer of value from debtor to creditor, a payment, whether that value be cash, bank bills, checks, labor or property, legal or equitable rights of any kind. This is so familiar a principle, that nothing need be said to render it plainer. 2 *Pars. on Contr.* 132, *etc.*, 4 *Bing.* 112; *Eyles vs. Ellis*, 5 *Ark.* 658; 2 *Saund. Pl. & Ev.* 715; 2 *Phil. Ev.* 492, *etc.*; 1 *Saund. Sup. Ct. R.* 50; 2 *Saund. Ch. R.* 151; 7 *Barr* 394 *to* 397; 1 *Port.* 423; 1 *Bailey* 4; 2 *Shep.* 89; 5 *Pick.* 1; 3 *Dev. & Bat.* 78; 7 *Ala.* 569; 3 *Scam.* 427; 4 *Blackf* 449; *Wright*, 88; 9 *Texas*, 405. Where there is but one debt, in substance, or the parties so treat it, no question can arise as to the appropriation of payments. Here was one debt, and all parties had equal interest in payment of all. 2 *Barn. & Cres.* 72; 3 *Bing.* 71, *Williams vs. Rawlinson*; 2 *Pars. Contr.* 144.

This being settled law, as between the immediate debtor and creditor, we cannot see how a doubt could arise, whether a payment could be made in any mode, or by any means known to the law, which would not displace the bar of the Statute.

If the question arose as to the party making the payment, the *mode* of payment assuredly could not be supposed to make any difference in its effect when made.

We do not understand it ever to have been decided that, in order to displace the Statute bar, as to a single debtor, or joint debtors, there must be a payment in money; but on the contrary, that anything constituting payment in a popular sense, or anything which could be given in evidence under a plea of payment at law, or would be recognized in equity as having like effect, would remove the bar as to a single, or joint debtor. *Turney vs. Dodwell*, 2 *Eng. C. L. & Eq. R*; 96, *etc.*; 2 *Metc.* 172,

296     CASES IN THE SUPREME COURT

Borden et al. vs. Peay, Receiver, etc.     [MAY

3; 2 *Greenl. Ev. sec.* 423; *sec.* 516; *Maillard vs. Duke of Argyle*, 6 *Man. & Gr.* 40; 23 *Engl. C. L. & Eq. R.* 37; 2 *Pars. Contr.* 353, 137; *Ang. Lim. sec.* 240.

There is no shadow of doubt here but that the express agreement alleged in the bill, that whatever work was done by B. J. Borden, should operate as payment upon his debts, did exist, and was acted upon by B. J. Borden and the Trustees. He had a right to make and carry out this agreement, after or before the notes were given. Every job of work done, was so soon as done a payment, and could so have been pleaded at law by the securities or himself. The Trustees could not have resisted it; to have done so, would have been a palpable fraud.

It is by no means necessary, at the time work is done or property transferred, that the price should be fixed, in order to constitute a payment, any more than it would be necessary to constitute a valid sale, or right to sue for the price, by the vendor of goods. The foregoing authorities abundantly show this. 28 *Eng. C. L. & Eq. R.* 464; 7 *Ala.* 569; *Wright* (*Ohio*) 88; 6 *Texas R.* 150; 5 *Texas*, 264.

If it were law that the parol contract, as to the mode of payment, was void or ineffectual, because not embodied in the notes, still the result in this case would not be different.

This proposition of law is not correct or applicable to this case: 1st. Because the notes were *first* to be given, before the parol contract could have any effect or be carried out. All parties knew, until Borden gave the notes, and *thereby* got the press, there was *no debt to pay*, nor *means to pay it*, as proposed. The very nature of the transaction involved the exclusion from the notes of any such subsequent matter. The assumption of the debts must be in writing, the other need not be. This assumption must in law exist, before the case arose, whereon the other stipulations would be in force or could operate or exist at all as a complete or binding contract. As was evidently the fact in this case, part of the general arrangement between the parties could be then perfected, the residue was allowed to rest in parol. In such case, it is every day's practice to prove the

parol contract, and to show the written contract was only part of the whole contract made and contemplated. 4 *Wash. C. C. R.* 290; 9 *Pick.* 338; and generally 3 *Phil. Ev. Cow. & H. notes* 1,471 *to* 1,474; 11 *Metc.* 205; 16 *Pen. St. Rep.* 48; 2 *Pars. on Contr.* 65.

The bill on its face presents clearly the facts which would cut out the bar; that is, that the payments were made from week to week, during the whole period, under the agreement of the parties, and that, because of these payments and this agreement, operating to the benefit of all, no suit was or could be in good faith brought, until Borden sold the press. 3 *Saund S. C. Rep.* 463; 2 *Sto. Eq. sec.* 1,521, *etc.*

No one ever disputed that an unpaid debt, barred by limitation, was, in *foro conscientiæ*, still a debt, which the party was in good faith bound to pay.

When a party, owing a ;fund, a debt barred but still in conscience due, assumes the trusteeship of that fund—must he not, in effect, by the same act, revive that debt? If not, his very act of acceptance of the trust, is a violation and repudiation of the good faith required of him.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

This is an appeal from a decree of the Chancery Court of Pulaski county.

The bill was brought in the name of Biscoe and others, as Trustees of the Real Estate Bank under the deed of assignment.

During the progress of the cause, Gordon N. Peay was substituted as complainant, the Trustees having been removed, and he appointed Receiver, by an order of the Chancellor. The defendants were Benjamin J. Borden, Wm. B. Borden, James Lawson, Luther Chase and Philip [L. Anthony. The object of the bill was to recover the balance due upon two notes executed by the defendants to the Trustees of the Bank. Chase being one of the Trustees, as well as one of the makers of the notes, at the time the bill was filed, the other Trustees had to

19

resort to the Court of Chancery to enforce the collection of the notes as against him.

During the progress of the cause, Chase departed this life, and his administrator, Wm. W. Adams, was substituted as defendant.

Lawson also died, and his administrator, John C. Peay, was made a party.

On the hearing, Anthony was discharged on the plea of limitation.

A decree was rendered against the other defendants, and Wm. B. Borden and the administrators of Chase and Lawson appealed.

All of the defendants in the Court below (except Benjamin J. Borden, the principal debtor,) interposed the statute of limitations as a bar to the relief sought against them by the bill; but the Chancellor decided that the statute was displaced by means of payments made by the principal debtor within the period of limitation, and the correctness of this decision is the main question to be determined here.

The original bill was filed on the 9th July, 1851.

The two notes, for $2,500 each, are dated 1st January, 1843, and payable 1st January, 1844, with eight per cent. interest from date. Interest paid in advance to maturity.

In a supplemental and amended bill filed by the complainants, it was alleged that, after the maturity of the notes, a payment was made upon them, and they were renewed; but the renewal of the notes was denied by the defendants; the alleged new notes were not exhibited nor produced upon the hearing, nor was there any competent evidence of their execution.

By the statute in force at the time of the execution and maturity of the notes, three years was the period of limitation to suits upon them. *Rev. Stat., chap.* 91, *sec.* 6; *Couch vs. McKee,* 1 *Eng. R.* 484; *Hawkins ve. Campbell, Ib.* 513.

To avoid the statute of limitations, the complainants, in the

supplemental and amended bill, make, in substance, the follow-
ing allegations:

In March, 1843, Benj. J. Borden purchased of Wm. E. Wood-
ruff the ARKANSAS STATE GAZETTE newspaper and printing office,
and in part payment therefor, agreed to assume $5,000 of
Woodruff's indebtedness to the Real Estate Bank; and in pur-
suance of the agreement, the notes in question were executed
to the Trustees of the Bank, bearing date 1st January, 1843,
and accepted by them in substitution for so much of Woodruff's
debt.

That it was agreed at the time, and before the notes were
executed, that Borden should be employed to do part of the
printing and advertising of the Trustees, and that the price of
all work so done by him should go towards paying off the notes;
which arrangement was not only known to the securities of
Borden, (*Chase, Lawson, Anthony and Wm. B. Borden*) but it
was the chief reason why they consented to sign the notes.

That upon the execution of the notes, Borden's purchase of
the Gazette, etc., was consummated, and he became the editor
and proprietor thereof, and so continued for several years: and
he was, in accordance with said agreement, so made by the
Trustees, through their attorney, with him and his securities,
constantly employed, until he disposed of the said newspaper
and printing office, in doing printing and advertising for the
Trustees.   That Chase, Lawson and Wm. B. Borden well
knew that he was paying off his indebtedness; and they all
expected, and had the right to expect, that as long as he con-
tinued to do such work, no suit should be brought on said notes.
That they all looked to his accounts for work to extinguish the
notes and relieve them from liability; and Benjamin J. Borden
could not, in good faith, appropriate, nor could said Trustees,
in good faith, allow him to appropriate the moneys so earned
by him from day to day, in any other way, it being the direct
understanding with all the parties, that the notes were to be so
paid by him; and the extension of time given him, and the de-

lay to sue, were with the fullest assent and concurrence, and for the benefit of the sureties.

That about the 1st of May, 1844, Borden rendered an account for printing and advertising up to that time, for $888 of which $714 28 were appropriated as a payment upon the two notes as of the 1st January, 1844, ($357 14 to each note,) and the remainder to the payment of advance interest upon the notes to the 1st January, 1845.

That on the 15th day of September, 1848, Borden presented to the Attorney of the Trustees, his account for printing and advertising, from the 5th day of June, 1844, up to that date, made out at Arkansas paper prices, estimating such paper to be worth about 30 cents in the dollar, and amounting in the aggregate to $1,715 29, that the same might be certified by the attorney so as to obtain credits for it on said notes:—and the account was accordingly certified by said attorney; and on the same day Borden directed the Cashier and Secretary of the Trustees to credit the amount of the account on said notes; which he did as of the 3d February, 1848; and Borden then receipted the account in the following words:

" Received of Thomas W. Newton, Cashier and Secretary, seventeen hundred and fifteen 29-100 dollars, the amount of the within account, by a credit on my notes to the Trustees of the Real Estate Bank, as of the 3d of February, 1848, which was signed by him and delivered to the Cashier and Secretary, and his printing and advertising account thus finally appropriated by him without any condition, limitation or reservation.

That Borden sold the Gazette office to Hayden about the 3d of February, 1848, who agreed to assume and pay the balance due on Borden's notes, after deducting the amount of the above account, but failed to do so, etc.

It may be stated in general terms that Wm. B. Borden, in his answer, denies any participation in, or knowledge of the alleged agreement between Benj. J. Borden and the Trustees, about the payment of the notes in printing, and submits that

his right to insist upon the statute of limitations could in no way be affected by any such agreement, etc.

Chase and Lawson died before the supplemental and amended bill was filed. The answer of the administrator of Chase may be regarded as putting in issue the truth of the allegations of the bill in relation to the agreement, etc., about the printing, etc., so far as they affect the rights of Chase; and it was agreed between the parties that the administrator of Lawson should abide the event of the suit as to the administrator of Chase, etc.

The only deposition read upon the hearing, by the complainant, was that of Mr. Pike, the attorney of the Trustees, so much of which as relates to the printing, etc., is in substance, as follows:

" The notes sued on were given under the following circumstances: Benj. J. Borden, about the 1st March, 1843, wished to purchase the ARKANSAS STATE GAZETTE newspaper, good will and printing office, and change it into a *whig* paper. Woodruff, the proprietor, owed the Trustees of the Real Estate Bank, whose attorney I was, a large debt, and was willing to sell for $1,000 in money, and $5,000 paid on that debt. Ten or twelve persons, of whom I was one, loaned Borden $1,000 to make the cash payment; and I agreed with him that he might renew $5,000 of Woodruff's debt to the Trustees under the circumstances. I was more particular in regard to the security than I would have been in any other case, and required Borden to furnish two notes, each for one half of the sum, one to be executed by himself as principal, and the other by his friend and relation, Lawson, as principal. The notes sued on were accordingly furnished, and accepted first by me, and afterwards by the Trustees. The whole debt was one debt, and the debt of Borden alone, although Lawson was principal in one of the notes; all the parties to the notes knew this perfectly well.

It was distinctly understood that I would not only give Borden all my own advertising patronage, but all that I could control in the way of printing and advertising of the Trustees of the

Real Estate Estate Bank.   In giving this work I neither appre-
hended or met with any difficulty, the Trustees allowing me to
have it done where I pleased.    At and before, and always after
the time of the execution of the notes; it was distinctly agreed
that the price of all work done by Borden, for the Trustees, should
go to pay off the two notes.   The arrangement was perfectly
known to Lawson, Chase and Wm. B. Borden, when they signed
the notes, and it was no inconsiderable inducement to them to
go into the transaction.   It was contemplated that Borden
would, before the trust ended, entirely pay off the notes with
his work, and so he would have done at the prices he charged,
if he had not, against my remonstrance, etc., sold the printing
office, etc.

On the payment of the one thousand dollars and substitution
of the notes in question, Borden was put in possession of the
office.   From that time until he sold it again, he was, every
few weeks, employed in doing some work, either printing or
advertising, for the Trustees.

About the 23d of April, 1844, he made out and presented an
account, amounting at Arkansas money prices to $888.   The
notes were credited, $357 14 each, and advance interest to 1st
January, 1845, etc.

On the 15th of September, 1848, he made out and presented
another account for printing and advertising, at Arkansas
money prices, at about three for one, amounting to $1,715 29.
Each of these accounts, I certified as correct, and ordered their
payment by the Cashier and Secretary.

Accordingly he received credit against the notes for $1715 29,
and endorsed on the last account a receipt accordingly, etc.
On the first account he endorsed a general receipt, etc.   I
annex the two receipts to this deposition.

I repeat that both of these accounts were made out at
Arkansas money prices, etc., and the appropriation of the lat-
ter towards said notes was unconditional and absolute, and the
amount was meant and intended to be equally divided, one
half on each note.

OF THE STATE OF ARKANSAS. **303**

TERM, 1859.]        Borden et al. vs. Peay, Receiver, etc.

I cannot recollect the precise language of any conversation which took place between myself and any one of Borden's securities after he gave the notes. Chase I saw almost every day, and on the 22d June, 1849, he became one of the Trustees. Lawson I also saw very often. He was the brother-in-law, and Wm. B. Borden was the brother of Benj. J. Borden. I well recollect inquiries being made of me by one and another of them, at different times, as to how Benj. J. Borden came on in regard to paying his debt. They were all aware how he was expected to pay it, and that no suit was to be brought while he continued to work for the Trustees. They looked to his accounts to extinguish the notes, and relieve them from liability. He could not, in good faith, appropriate them in any other way; nor could I, in good faith to them, allow him to do so. They all expected and required, and had the right to expect and require, that he should pay off the notes in that way; and they had a right to claim that they should not be sued, so long as he continued to do so. The extension of time was given with their full assent and concurrence, in conformity to the express understanding on which they became securities, and the indulgence granted was made for their benefit more than it was for his. As to Lawson, it was understood all the time that he was only nominally principal, and that Borden was to pay off that note with his work. There was little said about the appropriation of payments, because the securities were the same on both debts, which in fact were but one debt due by Borden; and whenever applied, the payment equally benefited all the parties."

It seems that the first account of Borden for printing, though rendered in May, was, by agreement between him and the attorney of the Trustees, allowed and appropriated as a payment upon the notes as of the 1st of January, 1844, the time when they fell due. The second account of Borden was rendered in September, and, by a like agreement between him and the attorney of the Trustees, allowed and appropriated as a payment upon the notes as of the 3d of February, 1848, at

**304**          CASES IN THE SUPREME COURT

Borden et al. vs. Peay, Receiver, etc.          [May

which time more than three years had elapsed from the maturity of the notes, and an action upon them was barred by the statute of limitations then in force.   The notes being at that time barred, the payment made by Borden, as of that date, revived the debts as to him, and formed a new point from which the statute began to run again, but did not revive the debts as against the other joint makers of the notes—the sureties.   *Biscoe et al. vs. Jenkins et al.*, 5 *Eng. R.* 108.

Such being the case made by the bill and evidence, here the controversy would terminate in a court of law; and here this opinion might conclude, but for the fact that we are disposed, through respect to the judgment and learning of the Chancellor, to consider the particular grounds upon which he denied to the appellants the benefit of the statute of limitations.

It may be remarked, that it must be borne in mind that this suit was cognizable in a court of chancery on no other ground than for the technical reason that Chase, one of the makers of the notes, could not be both plaintiff and defendant in a court of law; but that the demand is strictly a legal one, and the rules of limitation applicable to an action at law upon the notes must govern the remedy in equity.   *Faulkner et al. vs. Thompson et al.*, 14 *Ark.* 479.

The Chancellor held, *first*, that the Trustees, having delayed to sue upon the notes, in consequence of the agreement with Borden about the printing, with the knowledge and implied assent of the sureties, it was bad faith in them to attempt to avail themselves of such delay to defeat the suit finally brought upon the notes, and that in equity they would not be permitted to do so.

And this leads to the enquiry, how far it was competent for the Trustees to prove the agreement about the printing, and for what purpose.

The notes, upon their faces, were payable twelve months from their date in money.   This was the written contract between the parties, and it is a well established rule that evidence of a parol contemporaneous agreement contradicting or vary-

OF THE STATE OF ARKANSAS. **305**

Term, 1859.]        Borden et al. vs. Peay, Receiver, etc.

ing the written contract of the parties, is inadmissible. 1 *Greenl. Ev.*, sec. 275, *etc.* And this rule of evidence is applicable to suits in equity as well as at law. *Jordan ad. vs. Finno,* 13 *Ark.* 593; 4 *Eng. R.* 501.

If the Trustees had sued upon the notes immediately after their maturity, neither the principal debtor nor the sureties would have been permitted to introduce evidence of a parol agreement or understanding between the parties at the time the notes were executed, that they were to be paid in whole or in part by printing, and that the Trustees were to delay the collection of the notes, in order that the principal debtor might have the full benefit of such agreement. *Joyner vs. Turner,* 19 *Ark,* 690.

It is but reasonable that the rule should work both ways, and that the Trustees should not be permitted to prove such parol agreement to avoid the consequences of their delay to sue upon the notes.

If makers of notes were permitted, when sued upon them, to introduce evidence of parol, contemporaneous agreements as to the time and mode of payment, contradictory of their written contracts, to defeat the suits, it would open a wide door to mischief, which the rule of evidence in question was designed to close. So, if creditors could introduce evidence of such parol agreements, to account for delay in suing, and thus avoid the statute of limitations, a similar source of mischief would be opened. The policy of the law is, that the written contract entered into between the parties is to be looked to for the purpose of determining the time and mode of payment agreed upon by them.

The error of the Chancellor's opinion, under consideration, was in admitting incompetent evidence to ascertain if the sureties of Borden were acting in bad faith in pleading the statute of limitations, and then, upon such incompetent evidence, denying to them the benefit of the statute.

It was competent, however, for the Trustees to prove that Borden did printing for them, the time when done, and the

amount and price thereof, and that, by agreement of parties, the price of the work so done was appropriated as a payment upon the notes; because such evidence relates to the discharge of the notes, and in no way affects the terms of the written contracts.

The *second* ground upon which the Chancellor denied to the appellants the benefit of the statute of limitations, was, that euch item in the accounts rendered by Borden for printing was to be treated as a payment upon the notes *pro tanto,* as of the date of the *item,* and there being no period of three years between the payments so made, the bar never attached in favor of any of the parties.

The items in the first account rendered by Borden, as dated in the account, begin 12th July, 1843, and end April 25th, 1844. The items in the second account run, at short intervals, from the 5th June, 1844, to the 20th January, 1848. If each item in the accounts is to be treated as a payment upon the notes as of its date, as stated in the accounts, the notes were not barred on the 20th of January, 1848, the date of the last item in the second account, and the statute began to run anew as to all of the parties from that date. On the 30th of January, 1850, Borden made a payment of $1,000 upon the notes, in the note of Woodruff. He was also allowed a credit of $350, as of the 1st January, 1850, for printing done by Hayden, for the Trustees, after he purchased the printing press. The suit was commenced, as above stated, 9th of July, 1851: hence the cause of action was not barred as to the appellants, if each item of the accounts is to be treated as a payment as of its date, as held by the Chancellor. The two accounts rendered by Borden for printing, were not made exhibits to the bill, nor, strictly speaking, were they made exhibits to Mr. Pike's deposition. The receipts given by Borden for the accounts were made exhibits to the deposition, for the purpose of proving that the amount of each account was appropriated, by Borden, as a payment upon the notes, as alleged in the bill; and the receipts being

written upon the accounts, the latter were incidently brought into the record.

It was not alleged in the bill, nor proven, that it was at any time agreed or understood between Borden and the Trustees, or their attorney, that each item in the accounts was to be treated as a payment *pro tanto* as of its date, or that the price of each job of work done by Borden was to be a payment of so much of his debt to the Trustees, as of the time the labor was performed. Nor is there any thing in the pleadings or evidence from which such an agreement or understanding may be inferred; and such an inference would not harmonize with the conduct of the parties in relation to the accounts. The agreement was made between Borden and the attorney of the Trustees. They, of course, well understood its terms. The bill alleges, and the deposition of the attorney proves, that the first account of Borden was rendered in April, 1844, and that by agreement between him and the attorney, part of the aggregate amount of the account was then appropriated to the payment of advance interest upon the notes to the 1st January, 1845, and the remainder was appropriated as a payment upon the principal of the notes, as of the 1st January, 1844. That the second account was rendered in September, 1848, and after the price charged was adjusted and agreed upon, the amount of the account was, by an agreement between the same parties, appropriated as a single payment as of the 3d of February, 1848.

It seems to us, therefore, that we cannot, without doing violence to the allegations of the bill, the deposition of Mr. Pike, and the conduct of the parties, hold that each item in the accounts was a payment, as of its date, upon the notes; but that we must treat the aggregate amount of each account as a payment as of the date it was stated, allowed and appropriated, as such, by agreement of the parties to the transaction.

Moreover, the decree was entered February 12th, 1856, for $5,105 56, and it is manifest from the amount of the decree that the theory of the Chancellor's opinion, that each item in the accounts was to to be treated as a payment *pro tanto* upon

the notes, was departed from in drafting the decree; and interest calculated in reference to the times when the amounts of the accounts were allowed, appropriated and credited as payments, without regard to the dates of the several items in the accounts.

The Chancellor was inclined to the opinion that Chase should not be allowed the benefit of the statute of limitations, in consequence of his having been one of the Trustees, etc.

He was appointed a Trustee in June, 1849; at which time an action upon the notes was barred by the statute. The debt, according to the limitation law, as settled in this State, was then presumed to have been paid. It has been held by this Court, in a similar case, that the acceptance of the trust did not revive the barred debt: *Faulkner et al. vs. Thompson*, 14 *Ark.* 479. It was, perhaps, the duty of the administrators of both Chase and Lawson to interpose the statute of limitations as a defence to the suit. *Rogers et al. vs. Wilson et al.*, 13 *Ark.* 507; *Rector vs. Conway et al., present term.*

If there was a *moral* obligation resting upon the sureties of Borden not to avail themselves of the benefit of the statute, under the peculiar circumstances disclosed in this case, they must answer to a higher tribunal for that. Our province does not extend beyond the settlement of the *legal* rights and duties of the parties.

The decree of the Court below is reversed, and the cause remanded, with instructions to dismiss the bill as to appellants.